

B. McKay Mignault, Chief Bankruptcy Judge
United States Bankruptcy Court

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF WEST VIRGINIA
### AT MARTINSBURG

| | |
|---|---|
| IN RE:<br><br>DAVID ANDREW LEVINE<br>MONICA LARSON LEVINE,<br><br><br>                    Debtors. | CASE NO. 3:19-bk-1048<br><br>CHAPTER 13<br><br><br><br>JUDGE B. MCKAY MIGNAULT |
| THE TRUTH TELLERS, LLC,<br><br>                    Plaintiff,<br>v.<br><br>DAVID ANDREW LEVINE,<br><br><br>                    Defendant. | ADVERSARY PROCEEDING NO.<br>3:20-ap-36 |

### <u>MEMORANDUM OPINION AND ORDER</u>

This adversary proceeding was commenced by The Truth Tellers, LLC ("<u>Plaintiff</u>" or "<u>Truth Tellers</u>") on September 8, 2020. Plaintiff's Complaint [dkt. 1] (the "<u>Complaint</u>") asserts that five transfers in the aggregate amount of $49,949.71 that David Levine ("Mr. Levine" or "Defendant") admittedly caused to be made from Plaintiff's bank account to either himself personally or to his businesses between September 6, 2019 and September 20, 2019 (the "<u>Disputed Transfers</u>") are nondischargeable debts of David Levine pursuant to 11 U.S.C. § 523(a)(3) and (4).

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The Court is vested with subject jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

Defendant filed his Answer [dkt. 7] (the "<u>Answer</u>") to the Complaint on October 9, 2020.  The Court held a two-day trial in this matter on September 23–24, 2021 (the "<u>Trial</u>"), after which the Court received post-hearing briefs from the parties.

Plaintiff's *Proposed Findings of Fact and Conclusions of Law* [dkt. 88] ("<u>Plaintiff's Brief</u>") and Plaintiff's *Reply in Support of Proposed Findings of Fact and Conclusions of Law* [dkt. 90] ("<u>Plaintiff's Response Brief</u>") argue in part that the Disputed Transfers are nondischargeable pursuant to 11 U.S.C. § 523(a)(3) because Defendant knowingly failed to initially schedule his debt to Plaintiff.  Pl.'s Brief at 25–26.  However, because Plaintiff expressly waived this claim in its March 26, 2021 *Response to Defendant's Motion for Summary Judgment*, the Court will treat this claim as waived and not address it further.  *See* Pl.'s Response to Mot. for Sum Jud. [dkt. 14] at 8 ("Because of [Defendant's] timely amendment [of his bankruptcy schedules to include Plaintiff], The Truth Tellers, LLC no longer challenges the dischargeability of the [Disputed Transfers] under 11 U.S.C. § 523(a)(3).  Its challenge to dischargeability under 11 U.S.C. § 523(a)(4) remains.").

Plaintiff's Brief and Plaintiff's Response Brief also argue that the Disputed Transfers are nondischargeable pursuant to 11 U.S.C. § 523(a)(4) because Defendant either (a) committed fraud or defalcation while acting in a fiduciary capacity, (b) embezzled the Disputed Transfers, or (c) committed larceny with respect to the Disputed Transfers.  *See* Pl.'s Brief at 27–41.  Only the first two of these three arguments were asserted in Plaintiff's Complaint—Plaintiff's Complaint does not assert a count relating to larceny and does not even contain the word *larceny*.  Therefore, Plaintiff's argument with respect to larceny was not timely asserted in Plaintiff's nondischargeability Complaint and has been waived.  Fed. R. Bankr. P. 4007(c).

2

Defendant's *Post Trial Briefing in Support of Discharge* [dkt. 89] ("Defendant's Brief") and Defendant's *Response to the Plaintiff's Proposed Findings of Fact and Conclusions of Law* [dkt. 91] ("Defendant's Response Brief") argue that Defendant did not engage in acts of defalcation, fraud, or embezzlement because Plaintiff's President, Anne Meador, was involved in various business enterprises with Defendant and was aware of how money was accounted for by Defendant. *See*, *e.g.*, Def.'s Brief at 1–2. In short, Defendant asserts that Ms. Meador was aware of and consented to the Disputed Transfers. Additionally, Defendant argues that Plaintiff cannot show the culpable state of mind element required to prevail on a claim of fraud or defalcation in a fiduciary capacity or embezzlement. *Id*. at 2.

The matter is ready for adjudication.

# I.

## A.   Factual Background

Anne Meador, the principal and sole owner of the Plaintiff, met the Defendant in September of 2018 at a meeting of the Jefferson County Development Authority. She and Mr. Levine found that they shared the same interests in environmental issues; both were vehemently opposed to the construction of the Rockwool plant in Jefferson County, West Virginia. Almost a year later, on or about August 1, 2019, Ms. Meador and the Defendant began a physically and emotionally intimate relationship. Later in August of 2019, Mr. Levine and Ms. Meador agreed to enter into a business relationship that centered around the creation of a documentary film. The Defendant took Ms. Meador to see an attorney, and she created the Plaintiff company for that purpose. While setting up Truth Tellers with Defendant, Ms. Meador also opened a bank account for Truth Tellers. She established herself as President and Mr. Levine as Secretary of Truth

3

Tellers,[1] and Defendant was also made a signatory to the bank account.  The banking institution was also directed to send bank statements for the Truth Tellers account to a building owned by Mr. Levine.

Ms. Meador deposited $50,000 of her own personal funds into the Truth Tellers' bank account.  Soon after, the Plaintiff made the following transfers:

1. September 6, 2019: Nineteen thousand dollars ($19,000) to the Defendant's personal bank account that he shared with his wife (via check);

2. September 13, 2019: Seven hundred dollars ($700) to ThreeSquare, LLC;

3. September 18, 2019: Fifteen thousand dollars ($15,000) to Indeco Union; and

4. September 20, 2019: Fifteen thousand two hundred and fifty dollars ($15,250) to Indeco Union.

The total of these transfers amounted to $49,950 (collectively, and as noted previously, the "Disputed Transfers").  The parties do not disagree over whether the Disputed Transfers occurred; the only disagreement relating to these transfers is whether they constitute nondischargeable debts.

Less than three months later, on December 13, 2019, Mr. Levine and his wife filed a Chapter 13 bankruptcy petition; their case was later converted to a Chapter 7 proceeding.  The bankruptcy schedules did not initially list the Plaintiff as a creditor; however, Plaintiff received service of the bankruptcy case, filed a timely proof of claim, and eventually filed the instant adversary proceeding on September 8, 2020.  Following initiation of the adversary proceeding, the Defendant amended the schedules to list the repayment obligation with regards to the Disputed Transfers on September 11, 2020.

---

[1] The Defendant acknowledges that this action created a fiduciary relationship between himself and the Plaintiff.

4

In March of 2020, the Defendant ended his physically intimate and romantic relationship with Ms. Meador.

Of note are several companies formed by Mr. Levine and/or Ms. Meador.  Indeco Union ("Indeco") was formed by Mr. Levine in 2017 and was meant to pursue the tokenization of renewable energy and the creation of incentives and liquidity for green projects.  ThreeSquare, LLC ("ThreeSquare") was formed by Mr. Levine and his wife in 2002 and owns real property that is available for rental and/or lease.  Geostellar, Inc. ("Geostellar") was formed by Mr. Levine in 2010 to operate a marketplace for residential solar energy.  All of these entities are now in bankruptcy.

Mr. Levine also formed two other related entities: Climate Pictures (a non-profit company) and Our Climate, LLC (a single-purpose company created to produce an environmental documentary).  Climate Pictures eventually hired Ms. Meador, and she took over as President and ran the company until she was terminated in March of 2020.

Ms. Meador, during her relationship with Mr. Levine, also started a company called Basic Space, LLC ("Basic Space") which was intended to be a real estate holding company that would purchase commercial properties owned by ThreeSquare.  However, those transactions never occurred.

## C.    Arguments of the Parties

Both parties agree that the Defendant, as Treasurer of Plaintiff, owed fiduciary duties to the Plaintiff.  Therefore, the Court will accept Mr. Levine's fiduciary status as admitted and focus only on the remainder of the parties' arguments addressing whether the Defendant committed defalcation, fraud, or embezzlement such that the Disputed Transfers should be declared nondischargeable in Mr. Levine's bankruptcy case.

The crux of the disagreement is whether the Defendant withdrew and used the Disputed Transfers with or without Ms. Meador's knowledge and authorization. The Defendant argues that Ms. Meador was aware of and consented to the Disputed Transfers, which occurred during their intimate relationship, and that the obligation to repay those transfers was memorialized in the Truth Tellers Note. The Plaintiff avers that Ms. Meador had no knowledge of the Disputed Transfers — Ms. Meador testified that she did not consent to the Disputed Transfers and only discovered the Disputed Transfers had occurred after the Defendant terminated their intimate relationship, after which she sought information about the Truth Tellers account from the bank.

## II.

### A.      Governing Standard

Section 727(b) of the Bankruptcy Code states that "[e]xcept as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter . . . ." 11 U.S.C. § 727(b). Debts of the kind described in 11 U.S.C. § 523(a)(4) are exempt from discharge pursuant to § 727(b). The Plaintiff in a nondischargeability action bears the burden of proof to demonstrate, by a preponderance of the evidence, that a debt is exempt from discharge. *See Grogan v. Garner*, 498 U.S. 279, 283, 291 (1991).

Section 523(a)'s exceptions to discharge embody a basic policy of limiting relief only to an "honest but unfortunate debtor." *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998). Because Section 523(a)'s exceptions to discharge contravene the "fresh start" policy of the Bankruptcy Code, they are construed narrowly in favor of the debtor. *E.g., Kubota Tractor Corp. v. Strack (In re Strack),* 524 F.3d 493, 497 (4th Cir. 2008); *Quality Car & Truck Leasing v. Adkins*

6

*(In re Adkins)*, 567 B.R. 501, 507 (Bankr. S.D. W. Va. 2017); *see also Bullock v. BankChampaign, N.A.,* 569 U.S. 267, 268 (2013) ("[E]xceptions to discharge should be confined to those plainly expressed.") (internal citations omitted).

**B.      Analysis**

Specifically, Plaintiff asserts that the Disputed Transfers are exempt from discharge pursuant to Section 523(a)(4), which excepts from discharge debts arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Plaintiff's counts specifically allege that Defendant's debt to repay the Disputed Transfers is nondischargeable because Defendant committed (1) defalcation or fraud while acting in a fiduciary capacity or, alternatively, (2) embezzlement.

*A.      Defalcation While Acting in a Fiduciary Capacity*

To establish an exception to discharge for debts arising from defalcation while acting in a fiduciary capacity, Plaintiff must show, by a preponderance of the evidence, the existence of both: (1) a fiduciary relationship, and (2) defalcation while acting in that fiduciary capacity.  *See Grogan*, 498 U.S at 283, 291 (applying a preponderance of the evidence standard to § 523(a) causes of action).

"The definition of 'fiduciary' for purposes of § 523(a)(4) is controlled by federal common law and is narrower than under general common law." *Nicewander v. Nicewander (In re Nicewander)*, 634 B.R. 524, 532 (Bankr. S.D. W. Va. 2021); *Harrell v. Merchant's Express Money Order Co. (In re Harrell)*, 173 F.3d 850, 1999 WL 150278, *3 (4th Cir. 1999) (citing *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998)).  The "term 'fiduciary' is generally narrowly construed, and this is especially so in the bankruptcy context." *Fleming v. Gordon (In re Gordon)*, 491 B.R. 691, 698 (Bankr. D. Md. 2013) (citing *Ohio Co. v. Maynard (In*

7

*re Maynard)*, 153 B.R. 933, 935 (Bankr. M.D. Fla. 1993)).  However, courts often look to state

law as an important factor in deciding whether a fiduciary relationship exists.[2] Under the federal

common law, the term "fiduciary" includes express or technical trusts:

> The meaning of ["fiduciary capacity" as used in § 523(a)(4)] has been fixed by judicial construction for nearly a century. . . .  [T]he statute speaks of technical trusts, and not those which the law implies from contract.  The scope of the exception was to be limited accordingly.  Through the intervening years that precept has been applied by this court in varied situations with unbroken continuity. It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as trustee *ex maleficio*.  He must have been a trustee before the wrong and without reference thereto. . . .  The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created.

*Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S. Ct. 151, 79 L.Ed. 393 (1934) (internal

quotations and citations omitted); *Bradley v. Kelley (In re Kelley)*, 948 F.2d 1281, 1991 WL

249524, at * 2 (4th Cir. 1991).  Thus, under federal common law, a fiduciary is limited to instances

involving express or technical trusts, and the trustee's obligations must have been imposed prior

to, rather than by virtue of, any claimed misappropriation of funds.  *See Harrell*, 173 F.3d 850,

1999 WL 150278, at *3; *K&M Elec. Servs., Inc. v. Vito (In re Vito)*, 598 B.R. 809, 818 (Bankr. D.

Md. 2019) ("[M]ost courts following Supreme Court precedent hold that the trust and fiduciary

obligations must exist prior to the conduct giving rise to the claim.").  Constructive trusts and

resulting trusts generally fall short of the requirements of § 524(a)(4) because the trust relationship

---

[2]  *Regan v. Regan (In re Regan)*, 477 F.3d 1209 (10th Cir. 2007); *Blaszak v. Blaszak (In re Blaszak)*, 397 F.3d 386 (6th Cir. 2005); *Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta)*, 394 F.3d 347 (5th Cir. 2004); *The Andy Warhol Found. v. Hayes (In re Hayes)*, 183 F.3d 162 (2d Cir. 1999); *Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane)*, 124 F.3d 978 (8th Cir. 1997), *cert denied*, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.E.3d 109 (1998); s*ee also Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493 (4th Cir. 2008).

is created at the same time as the debt. *See, e.g., Harrell*, 173 F.3d 850, 1999 WL 150278, at \*3; *Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813, 816 (11th Cir. 2016) ("[C]onstructive or resulting trusts, which generally serve as a remedy for some dereliction of duty in a confidential relationship, do not fall within the § 523(a)(4) exception because the act which created the debt simultaneously created the trust relationship.") (internal citations and quotations omitted). Furthermore, the "types of fiduciary capacity intended by Congress to render a debt non-dischargeable are persons in positions of ultimate trust, such as public officers, executors, administrators, guardians, trustees of express trusts, attorneys, and corporate directors." *In re Gordon*, 491 B.R. at 698 (internal citations omitted).

"In some circumstances, a technical trust relationship may be created by state statute or common law doctrines that impose trust-like obligations on a party sufficient to render the debtor a fiduciary within the meaning of section 523(a)(4)." 4 COLLIER ON BANKRUPTCY ⁋ 523.10[1][d] (Alan N. Resnick & Henry J. Sommer, eds. 16th ed.); *see also, e.g., LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 784–85 (5th Cir. 1993) ("Most courts today, however, recognize that the 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law."). This Court has recognized that technical trust requires "trust-type obligations that are imposed under statute or common law." *Gillespie v. Gillespie (In re Gillespie)*, No. 3:16-ap-03011, 2017 WL 3175900, at \*3 (Bankr. S.D. W. Va. July 25, 2017) (citing *Huntington Nat'l Bank v. Aman (In re Aman)*, 498 B.R. 592, 604 (Bankr. N.D. W. Va. 2013)). Fiduciary relationships require "the same high standard as a trust" and may be created where there is a difference in knowledge or power between the fiduciary and principal. *Id.*

These are relationships that require the principal to repose a special confidence in the fiduciary beyond a mere debtor-creditor relationship. *See id.*

> If, where a person pays money for property which is at the time conveyed to another, the circumstances are such as to give rise to a resulting trust for the benefit of the payor, the trust arises immediately when the payment is made. Such trust cannot arise if the legal title itself depends on a contingency at variance with the trust theory, or the alleged beneficial interest is conditional.

*Id.* at Syl. Pt. 8.

Second, Plaintiff must establish that Defendant committed an act of defalcation while acting as a fiduciary. While the precise meaning of "defalcation" for purposes of § 523(a)(4) has never been entirely clear, the Fourth Circuit has defined the tort of defalcation as "'the failure to meet an obligation' or 'a nonfraudulent default.'" *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001) (citing *Black's Law Dictionary* 427 (7th ed. 1999)). Other courts have also described defalcation as "a failure to produce funds entrusted to a fiduciary." *In re Fernandez-Rocha*, 451 F.3d at 910 (citing *Quaif v. Johnson*, 4 F.3d 950, 955 (11th Cir. 1993)). Additionally, the Supreme Court has included a state of mind requirement for defalcation. In *Bullock v. BankChampaign, N.A.,* the Supreme Court held that defalcation under § 523(a)(4) includes a culpable state of mind requirement "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock*, 569 U.S. at 269. An intentional wrong encompasses "not only conduct that the fiduciary knows is improper, but also reckless conduct of the kind that the criminal law also treats as equivalent[,]" such as when a fiduciary "consciously disregards (or is willfully blind to) a substantial and unjustifiable risk" that his conduct will result in a breach of fiduciary duty." *Id*. at 273-74.

Both the Plaintiff and Defendant have agreed that the Defendant, at all times relevant to this matter, had a fiduciary duty to the Plaintiff.  Therefore, this Court's analysis will focus on the second part of the inquiry — whether the Defendant's acts constitute defalcation.

A major part of that analysis revolves around a relatively simple question: did Ms. Meador, as sole Member and President of the Plaintiff, know about and approve the Disputed Transfers made by Defendant from the Plaintiff's bank account?  The Disputed Transfers at question in this proceeding total $49,949.71, as follows:

1. $19,000 transferred from the Plaintiff's bank account to Mr. Levine via check on September 6, 2019:

   a. $16,400 of this amount was paid via check to Specialized Loan Servicing, the Levines' mortgage servicer; and

   b. $2,599.71 of this amount was deposited into David and Monica Levine's personal bank account;

2. $700 was transferred from the Plaintiff's bank account to ThreeSquare on September 13, 2019;

3. $15,000 transferred from the Plaintiff's bank account to Indeco's bank account on September 18, 2019; and

4. $15,250 transferred from the Plaintiff's bank account to Indeco's bank account on September 20, 2019.

It is uncontroverted that Mr. Levine initiated all these transactions.  He steadfastly claims that Ms. Meador was aware of these transfers and approved them, and that her initial investment of $50,000 into Truth Tellers was basically money that Ms. Meador originally offered to as a personal loan to him.  Mr. Levine testified that, instead of accepting these funds directly,

11

he suggested that she put it into a company of which she was the sole owner (the Plaintiff) to increase Ms. Meador's chances of being repaid given the likelihood that he would soon file bankruptcy. 9/24/21 Tr. at 65:15—67:9. Ms. Meador vehemently contends that she had absolutely no knowledge of the Disputed Transfers and had neither approved them nor authorized Mr. Levine to enter into any transactions on behalf of the Plaintiff. 9/23/21 Tr. at 125:17–22; 9/23/21 Tr. at 128:10–13; 9/24/21 Tr. at 51:7–10. In fact, she claims that he concealed these transfers from her. 9/23/21 Tr. at 128:10–13; 9/24/21 Tr. at 51:7–10. Ms. Meador testified that she did not learn about the Disputed Transfers until she checked the Plaintiff's bank account in March of 2020, after Defendant broke off their relationship and a full seven months after the Plaintiff was formed and the bank account created. 9/23/21 Tr. at 124:16–125:11; 9/23/21 Tr. at 139:8–139:15.

The Court finds Ms. Meador's testimony on this issue far less credible than Mr. Levine's. First of all, the inconsistencies are glaring: Ms. Meador testified that she had not seen the Disputed Transfers because she was denied online access to the accounts around February 3, 2020. 9/23/21 Tr. at 139:16–19; 9/23/21 Tr. at 139:21–140:6. However, in Plaintiff's Amended and Corrected Responses to the Defendant's First Set of Requests for Admissions, it was admitted that Ms. Meador had access to all bank accounts of the Plaintiff from the time of its formation, including the ability to review all bank transactions of the Plaintiff from its formation and the ability to limit access to all bank accounts of the Plaintiff from its formation. 9/23/21 Tr. at 141:17–143:4. Ms. Meador also testified that the reason she had not accessed the Plaintiff's bank account at all was because Mr. Levine "came on very strong," told her she was "his great love," that he was going to leave his wife for her, made plans for the future with her, and "put on a very convincing act" that made her "trust[] him completely." 9/23/21 Tr. at 184:17–9.

12

Even more telling is her own admission that she had previously been able to see and access the Plaintiff's account. She explained that, when Mr. Levine changed the Plaintiff's bank account password around the time of the Truth Tellers Note (early February, 2020), she noticed when logging into the linked Climate Pictures account that she could *no longer* see the Plaintiff's account balance or transactions. 9/23/21 Tr. at 139:21–140:6. Importantly, Ms. Meador testified that she regularly accessed the online account of Climate Pictures, as she was also employed by that entity and had to set up payroll and insurance and "needed to keep an eye on the balance to make sure that any debits were being covered." 9/23/21 Tr. at 140:1–4.

The only logical result of these statements by Ms. Meador is that she noticed a change in electronic access to Plaintiff's account in February 2020 because *she had been able to electronically monitor the Plaintiff's account prior to February of 2020*, including during the time when the Disputed Transfers occurred. Furthermore, the Plaintiff's bank account and the Climate Pictures bank account were linked with a third: the bank account of Indeco. 9/23/21 Tr. at 139:21–24. It was never alleged that Mr. Levine changed the password to the Indeco account, so Ms. Meador would at the very least have been able to view the Disputed Transfers remitted into the Indeco bank account.

Additionally, although Ms. Meador's counsel attempted to paint her as an individual unfamiliar with and unsophisticated in business transactions and financial matters, the evidence in the record demonstrates otherwise. Ms. Meador was entrusted to run Climate Pictures, which involved obtaining and maintaining insurance policies through the entity, as well as "keeping an eye on payroll" and making sure obligations were being paid. 9/23/21 Tr. at 140:1–4. Ms. Meador had experience with evaluating financial expenditures when she was employed with the W. Alton Jones Foundation and, in fact, was responsible for raising money via grants and

13

donations while working with Earth Rights International as the Director of Development.  9/23/21
Tr. at 101:12–25.  Ms. Meador also co-founded a company called D.C. Media Group prior to
meeting Mr. Levine.  9/23/21 Tr. at 104:5–16.

   The Court therefore finds that Ms. Meador, the sole Member and President of the
Plaintiff, was aware of the Disputed Transfers.  And, though she was obviously able to access the
Plaintiff's bank account prior to February 2020 and was aware of the Disputed Transfers, there is
no evidence that Ms. Meador ever protested Mr. Levine's use of the Disputed Transfers or
demanded repayment of those funds until after Defendant terminated their romantic relationship.
The lack of such evidence comports with Mr. Levine's testimony that the Disputed Transfers were
made with the consent and authority of Ms. Meador as sole member and President of Plaintiff.
Therefore, the Court concludes that the Disputed Transfers are not nondischargeable as defalcation
by a fiduciary.

   Furthermore, the doctrine of ratification supports the Court's finding.  "Ratification
by silence may be inferred when, despite obtaining full knowledge of the material facts relating to
a transaction, a responsible party fails to promptly disavow the action."  *In re Tara Retail Grp.,
LLC*, No. 17-bk-57, 2017 WL 1788428, at *4 (Bankr. N.D. W. Va. May 4, 2017) (discussing *Jape
v. Reliable Air, Inc. (In re Reliable Air, Inc.)*, No. 05-85627, 2007 WL 7136475, at *4 (Bankr.
N.D. Ga. Mar. 9, 2007)); *see also Proctor v. Metro. Money Store Corp.*, 579 F. Supp. 2d 724, 740
(D. Md. 2008) ("Intention to ratify may be inferred by . . . silence on the part of the principal that
reasonably indicates its desire to affirm the unauthorized act.").  Even if the Court were to find
that Mr. Levine's acts were not expressly authorized, it follows that his actions were nonetheless
ratified by Ms. Meador's silence.  As noted above, she was clearly able to see the Disputed
Transfers that took place in September of 2019.  She said nothing and did not object to those

transfers until shortly after Mr. Levine ended their romantic relationship approximately six months later, in March of 2020.

Accordingly, this Court finds that the Plaintiff has not proven by a preponderance of the evidence that the Disputed Transfers rise to the level of defalcation under 11 U.S.C. § 523(a)(4).

### B.    *Fraud While Acting in a Fiduciary Capacity*

In addition to establishing that a fiduciary relationship exists, which is admitted in this case, Plaintiff must show by a preponderance of the evidence that Defendant committed fraud while acting as a fiduciary. *Grogan*, 498 U.S. at 289.

"For the purposes of section 523(a)(4), fraud means 'positive fraud, or fraud in fact, involving moral turpitude or intentional wrong.'" *In re Vito*, 598 B.R. at 817 (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1877)).  The standard for fraud is higher than that of defalcation, as it involves "intentional deceit." *Thadavong v. Walker (In re Walker)*, 416 B.R. 449, 467 (Bankr. W.D.N.C. 2009).  Any allegations of "implied fraud or fraud in law which may exist without bad faith or immorality" will not meet the requirements of § 523(a)(4). *Lawrence Steel Erection Co. v. Piercy (In re Piercy)*, 140 B.R. 108, 114 (Bankr. D. Md. 1992).

As stated above, the bar for conduct to be considered fraudulent under § 523(a)(4) is higher than that of defalcation because it requires "intentional deceit."  Because the Court finds that Ms. Meador was aware of the Disputed Transfers and authorized them, either expressly or by ratifying them after the fact, the Court likewise holds that the Disputed Transfers were not fraudulent.  Plaintiff has failed to show that the debt was obtained by Defendant's "intentional deceit" and, therefore, cannot satisfy the level of intent required to demonstrate fraud under § 523(a)(4).

### C.    *Embezzlement*

Under § 523(a)(4), embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Harrold v. Raeder (In re Raeder)*, 399 B.R. 432, 439 (Bankr. N.D. W. Va. 2009) (*quoting Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998)) (internal quotation marks omitted).   Unlike larceny, embezzlement occurs when "the original taking of the property was lawful, or with the consent of the owner." *Id.*   Embezzlement further requires a showing of wrongful intent.   *Bullock*, 569 U.S. at 274.   Specifically, embezzlement requires "actual, intentional fraud." *Gough Street Liquor, LLC v. Cockey (In re Cockey)*, 622 B.R. 178, 189 (Bankr. D. Md. 2020) (citing *Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 116 (6th Cir. B.A.P. 2007)).

As stated above, a finding of embezzlement requires a showing of wrongful intent. Because the Disputed Transfers have not even met the less stringent state of mind requirement for defalcation under § 523(a)(4), which does not require a showing of wrongful intent, the Court concludes that Plaintiff likewise has not presented evidence satisfying level of intent required for embezzlement under § 523(a)(4).[3]

---

[3]   Because the same level of intent is required to prevail on a claim of larceny, the Court would reach the same conclusion if Plaintiff had preserved the claim of larceny by timely asserting that cause of action in the Complaint.

## I.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A. Findings of Fact**

*Mr. Levine*

1. David Andrew Levine is a 1988 graduate of Yale University; he received his degree in Philosophy upon graduation.  9/23/21 Tr. at 11:20–12:8.  After his time at Yale, Mr. Levine took graduate courses at the University of Michigan under a Rackham Memorial Fellowship Award.  9/23/21 Tr. at 12:19–13:2.

2. Mr. Levine has been involved in creating seven business entities.  9/23/21 Tr. at 15:2–16:2.

3. With regard to corporate governance, Mr. Levine testified that he understood that corporate officers and managers have fiduciary duties to the company or corporation, meaning that an officer or manager must act in such a way that it benefits the company or corporation's principals.  9/23/21 Tr. at 16:13–17:2, 22:5–23:12.

4. Mr. Levine served as Secretary of the Plaintiff, and Mr. Levine acknowledges that, as Secretary, he owed a fiduciary obligation to the Plaintiff.  9/23/21 Tr. at 17:3–21, 24:2–6.

5. Mr. Levine's business experience includes professionally raising money for new or existing business ventures "nine or ten" times.  9/23/21 Tr. at 47:18–24.

6. The Court finds that Mr. Levine is a sophisticated businessman and experienced in business matters.

17

*Ms. Meador*

1. Anne Meador is a 1991 graduate of Wake Forest University, where she double majored in Music Performance and Russian Language. 9/23/21 Tr. at 98:17–19. She went on to receive a master's degree from University of Virginia in Slavik Linguistics, and also completed a program called All But Faces at Rawlins University in 1999. 9/23/21 Tr. at 98:19–22.

2. After receiving her master's degree from the University of Virginia, Ms. Meador transitioned to work as a librarian for several years. 9/23/21 Tr. at 100:2–16. She then was employed by an environmental foundation, named the W. Alton Jones Foundation, located in Charlottesville, Virginia. 9/23/21 Tr. at 100:19–24. At the foundation, she was responsible for evaluating grantee reports to see if they had met the requirements of the grants they had received (essentially, if they had spent the grant money on what it was supposed to be spent on). 9/23/21 Tr. at 101:5–8; 9/23/21 Tr. at 130:25–131:2. Once she had worked for the foundation for about a year, she moved to Washington, D.C. and was hired by an environmental non-profit called Earth Rights International to be the Director of Development. 9/23/21 Tr. at 101:12–25. She was tasked with raising money via grants and individual donations. 9/23/21 Tr. at 102:1–4. When she left that job after approximately two years, Ms. Meador testified that she did several things: taught yoga, cleaned the yoga studio, helped create a day labor center in northern Virginia, worked for her father's business, volunteered at an animal shelter and a food pantry, and fostered pets for an animal rescue. 9/23/21 Tr. at 102:8–19.

3. Ms. Meador eventually became a freelance journalist and photojournalist in 2011. 9/23/21 Tr. at 103:22–104:6. She co-founded a media group called D.C. Media Group and a website with some other individuals and covered political activity, such as the "Occupy," "Arab Spring," and later, the Black Lives movements. 9/23/21 Tr. at 104:5–16. She eventually shifted her focus to industrial projects that were unwanted by the communities in which they were proposed, such as the Mountaineer Gas Pipeline and the Rockwool factory. 9/23/21 Tr. at 105:1–10.

4. Ms. Meador was also involved in founding and running multiple businesses during her relationship with Mr. Levine, as discussed below.

5. The Court finds that Ms. Meador is an educated woman who is both knowledgeable and experienced in business matters.

### The Relationship

1. Mr. Levine and Ms. Meador met in September of 2018 at a Jefferson County Development Authority meeting concerning the planned Rockwool factory installation. 9/23/21 Tr. at 76:21–77:1. They remained in touch, seeing each other at various meetings and eventually struck up a friendship, during which Mr. Levine assisted Ms. Meador with removing data from some CDs she had acquired. 9/23/21 Tr. at 77:5–14.

2. Mr. Levine co-founded an organization called Resist Rockwool, which led to protests against the factory. 9/23/21 Tr. at 107:16–19. Ms. Meador saw Mr. Levine at these protests and would get quotes from him for her articles. 9/23/21 Tr. at 107:20–21.

19

3. Mr. Levine and Ms. Meador's relationship evolved into a physical relationship in August of 2019 and lasted until March of 2020. 9/23/21 Tr. at 59:8–60:11.

4. Their relationship was also a romantic one. Although Mr. Levine initially characterized the relationship as lacking romance or intimacy (9/23/21 Tr. at 59:8–60:11), Ms. Meador vehemently objected to that characterization, describing how Mr. Levine immediately started "showering [her] with attention, intimacy, affection, words of love. And also business ideas. You know, he said I want to build an empire with you." 9/23/21 Tr. at 110:22–11:2. She explained that Mr. Levine called her "his great love", said he was "always here for [her]," and told her he was "a hundred percent sure" about her and that he was going to leave his wife for her. 9/23/21 Tr. at 111:7–19. Mr. Levine later admitted on the witness stand that "those things [Ms. Meador] reported me saying about her being precious, I said that and I believe that." 9/24/21 Tr. at 119:15–19.

5. Ms. Meador testified that Mr. Levine almost immediately started speaking about marriage and had made a marriage proposal to her within a month of the beginning of their physical relationship. 9/23/21 Tr. at 112:2–15. Mr. Levine denied this outright and stated that he "never made an offer of marriage to her." 9/24/21 Tr. at 117:3–4.

6. Ms. Meador also contended that Mr. Levine began discussing business with her straightaway after their physical relationship commenced; he spoke to her of selling her his buildings "like, the next day," during "breakfast after the seduction." 9/23/21 Tr. at 113:9–12; 9/23/21 Tr. at 114:3.

7. Generally, Ms. Meador stated that Mr. Levine solicited money from her "in all kinds of ways." 9/23/21 Tr. at 113:24–25.

8. In absolute contrast, Mr. Levine testified that Ms. Meador began in August of 2019 by offering him a $50,000 personal loan based on their friendship. 9/24/21 Tr. at 60:14–23. He refused that offer because he knew it was a possibility that he would soon file for bankruptcy and would not be able to repay her. 9/24/21 Tr. at 60:24–61:3. He stated that Ms. Meador informed him of $2 million held for her in a trust fund, and he looked to how she could get a return, instead of just lending him money; they spoke about how to structure the entities they were going to open, what to present as a real estate deal, and how to move the money from the trust into investments that she could control. 9/24/21 Tr. at 61:4–63:1.

9. Ms. Meador testified about some messages she had exchanged with Mr. Levine's wife in August of 2019 and October/November of 2019. 9/23/21 Tr. at 160:10–161:4. In one of the August, 2019 messages, Ms. Meador referred to herself as a "very prudent person who does due diligence" when referring to a property purchase/investment Mr. Levine had asked for that "ballooned" from $50,000 to $600,000. 9/23/21 Tr. at 161:12–162:16; 9/23/21 Tr. at 169:23–170:12. The investment opportunity had begun with the $50,000 investment in Truth Tellers and had escalated to a $600,000 real estate investment deal. 9/24/21 Tr. at 48:3–12.

10. After filing his personal Chapter 13 bankruptcy case in December of 2019, Mr. Levine approached Ms. Meador and asked for money to pay legal fees for: (1) his defamation lawsuit, and (2) his divorce. 9/23/21 Tr. at 121:19–122:2.

11. Mr. Levine claims that he eventually ended the relationship because he realized that he loved his wife and his family, and Ms. Meador demanded that he choose between her and his wife.  9/24/21 Tr. at 119:23–120:11.  He stated that he had a "long conversation" with Ms. Meador about their relationship on March 8, 2020, and he followed that up with a break-up e-mail, but he had attempted to break things off with her weeks earlier in January or February of 2020. 9/24/21 Tr. at 157:2–159:25; 9/24/21 Tr. at 164:23–165:4; 9/24/21 Tr. at 204:19–20.

***Truth Tellers***

1. Prior to the formation of the Plaintiff, Mr. Levine had been an Entrepreneur in Residence with the More to Life Foundation ("More to Life"); the name "Truth Tellers" came from the founder of More to Life, K. Bradford-Brown.  9/24/21 Tr. at 55:23–56:18.  Contemporaneously with meeting Ms. Meador, Mr. Levine and More to Life had begun filming and conducting interviews for a documentary film about K. Bradford-Brown, which included travel to England and participation in a week-long program to become familiar with More to Life's training techniques. 9/24/21 Tr. at 56:19–57:8.

2. More to Life had a contract with the entity Climate Pictures for the making of the documentary.  9/24/21 Tr. at 58:10–11.  Mr. Levine and More to Life hired Ms. Meador full time and he asked her to take over as President of Climate Pictures; she agreed and took care of acquiring health insurance for the employees.  9/24/21 Tr. at 58:8–17.

3. Eventually, the relationship between More to Life and Climate Pictures was terminated.  9/24/21 Tr. at 144:5–7.

4.   The purpose of forming the Plaintiff has been described in different portions of the testimony as: 1) to make a documentary about the Rockwool factory, and 2) to make a documentary about More to Life and K. Bradford Brown; Mr. Levine and Ms. Meador planned to raise money from the major donors to More to Life, and they expected investments.   9/23/21 Tr. at 24:16–25:3; 9/23/21 Tr. at 86:3–7; 9/24/21 Tr. at 58:18–59:11; 9/24/21 Tr. at 76:24–81:24.   With Ms. Meador's background in journalism and video journalism, she and Mr. Levine thought that a documentary on the Rockwool factory would be an excellent project.  9/23/21 Tr. at 83:4–23.   Mr. Levine posed the formation of the Plaintiff and the making of the documentary to Ms. Meador as an investment, as he expected it would make a profit.   9/23/21 Tr. at 115:3–11.   Mr. Levine at the time also considered his company Indeco a potential vehicle for liquidity for what Mr. Levine states they called "their empire," which included the Plaintiff, along with other entities formed by Mr. Levine named Our Climate and Climate Pictures.  9/23/21 Tr. at 85:13–16; 9/23/21 Tr. at 83:13–86:7.   At around the same time, Ms. Meador formed Basic Space, LLC, which was intended to be a real estate holding company which was going to purchase a property from an entity called ThreeSquare (also owned by Mr. Levine and his wife). 9/23/21 Tr. at 86:8–15. Ms. Meador testified that Mr. Levine "brought his buildings up right away and really pushed them," and he "just made it sound so great and we were going to start a co-working business in the Martinsburg building."  9/23/21 Tr. at 112:16–113:2.

5.   Although she had reservations about making the documentary, Ms. Meador "believed [Mr. Levine's] spin on it, that it was going to be profitable and everybody

23

was going to be really excited.  We were going to go to Hollywood and pitch it. We were going to go to Sundance.  He had a friend that worked at Viacom and she was going to procure all these connections for us."  9/23/21 Tr. at 137:10–139:7.

6. Mr. Levine admitted that, at the time the duo formed the Plaintiff, he was financially devastated.  9/23/21 Tr. at 86:16–21; 9/24/21 Tr. at 59:16–19.  Ms. Meador also acknowledged that she knew of Mr. Levine's dire financial condition; she understood as early as August or September of 2019 that he was considering filing for bankruptcy protection.  9/24/21 Tr. at 14:13–17.

7. According to Mr. Levine, he and Ms. Meador discussed the formation of the Plaintiff in detail and attended several meetings with an attorney.  9/24/21 Tr. at 64:7–21.  He described Ms. Meador's participation in the meetings as "extensive." 9/24/21 Tr. at 64:22–24.

8. Ms. Meador and Ms. Levine went to see an attorney, and Mr. Levine instructed the attorney to create an LLC in Ms. Meador's name called Truth Tellers, LLC. 9/23/21 Tr. at 115:18–23.  Ms. Meador was the only member, and the Plaintiff was registered in Delaware.  9/23/21 Tr. at 116:1–6.  Mr. Levine also had the attorney draft an operating agreement for the Plaintiff, but it was never finalized.  9/23/21 Tr. at 116:7–13.

9. Mr. Levine, Ms. Meador, and "Summer Nails" (the commercial banking representative) were all present on August 30, 2019, when the Plaintiff's bank account was opened at BB&T in Shepherdstown, West Virginia.  9/23/21 Tr. at 15:8–20.

24

10. On the BB&T Resolution and Agreement for Deposit Account, Mr. Levine is listed as Secretary and Ms. Meador is listed as Member and Manager.  Plaintiff's Exh. 2. Both were authorized to open, close, and transact business on the account. *Id.*  Both Mr. Levine and Ms. Meador completed signature cards for the account.  Plaintiff's Exh. 3.  Ms. Meador stated that Mr. Levine asking to be Secretary and requesting to be signatory was completely unexpected at the time, but she did not object to his request.  9/23/21 Tr. at 117:13–19.

11. The bank statements for Plaintiff's bank account were sent to: Truth Tellers LLC, 123 E. German St., Shepherdstown WV 25443-3528.  Plaintiff's Exh. 5A.  Mr. Levine owns that property; it is a building that Mr. Levine and Ms. Meador were planning on using as the Plaintiff's corporate office.  9/23/21 Tr. at 33:4–15.

*The Transfers*

1. At the time it was opened, Plaintiff's bank account was linked with two other accounts: that of Indeco and that of Climate Pictures.  9/23/21 Tr. at 139:21–24. Ms. Meador regularly accessed the online account of Climate Pictures, as she was also employed by that entity and had to set up payroll and insurance and "needed to keep an eye on the balance to make sure that any debits were being covered." 9/23/21 Tr. at 140:1–4.

2. According to the Plaintiff's bank statements, the following pertinent transfers were made into the account:

   a. September 6, 2019: $20,000, from Ms. Meador, by wire transfer;

   b. September 16, 2019: $30,000, from Ms. Meador, by wire transfer;

3.  According to the Plaintiff's bank statements, the following pertinent transfers were made from the account:

   a.  September 6, 2019: $19,000, by check;

   b.  September 13, 2019: $700, by Mr. Levine, via transfer to a different checking account;

   c.  September 18, 2019: $15,000, by Mr. Levine, via transfer to a different checking account; and

   d.  September 20, 2019: $15,250, by Mr. Levine, via transfer to a different checking account.  Plaintiff's Exhx. 5A – 5G; 9/23/21 Tr. at 61:25 – 62:8.

4.  Ms. Meador made the two initial transfers into the bank account ($20,000 + $30,000) "to fund the Truth Tellers documentary after the contract was finished." 9/23/21 Tr. at 118:17–25.  However, the contract was never completed, there was never a film made, and although a film was pursued, the collaboration with More to Life fell apart in October of 2019. 9/23/21 Tr. at 119:1–11.  Ms. Meador testified, specifically, that there was never a script, and, although videographers were hired by Mr. Levine, they never produced a film.  9/23/21 Tr. at 119:14–25.  However, Ms. Meador later testified that she had seen a script "that was so bad it couldn't be made," and she had also traveled to New York and London to film protests and work with a videographer on editing a documentary trailer.  9/23/21 Tr. at 127:20–128:6; 9/23/21 Tr. at 136:14–137:9.

5.  In contrast, Mr. Levine testified that the initial $50,000 investment was the money that Ms. Meador originally offered to loan him, and he had instead suggested that she put it into a company of which she was the sole owner (the Plaintiff.).  9/24/21

26

Tr. at 65:15–22.  He further testified that Ms. Meador had been enthusiastic about

the documentary until she returned from England, where he understood that she had

a terrible experience.  9/24/21 Tr. at 78:15–24.

6. On September 6, 2019, Mr. Levine signed a check for $19,000, drawn on the

Plaintiff's account, made payable to himself.  Plaintiff's Exh. 4B; 9/23/21 Tr. at

30:3–13.  The memo line stated: "Advance/Loan for Creative Rights."  Plaintiff's

Exh. 4B.  Following that transfer, on the same day, a check was issued to

Specialized Loan Servicing in the amount of $16,400.19, with the memo line

containing an account number.  Plaintiff's Exh. 4C.  Mr. Levine testified that the

source for the funds spent to Specialized Loan Servicing was "probably" the

$19,000 deposited from the Plaintiff's account.  9/23/21 Tr. at 30:24–31:9.  Ms.

Meador testified that she believed Specialized Loan Servicing to be Mr. Levine's

mortgage company for his personal residence and she knew that he took the

$19,000 check "he wrote to himself at the counter and had an official check made

out to his mortgage lender."  9/23/21 Tr. at 183:12– 22; 9/24/21 Tr. at 42:11–18.

The balance of the $19,000 was then deposited into Mr. Levine's personal bank

account.  9/24/21 Tr. at 42:22–43:1.

7. With regard to the memo line discussed just above, stating that the check was an

"Advance/Loan for Creative Rights," Mr. Levine testified that the payment of

$19,000 was made for the purpose of "transferring [] [his] personal rights in the

treatments, the video [they] had shot . . . Because without the rights to what I had

previously created the entity really couldn't do anything."  9/23/21 Tr. at 92:8–16.

Essentially, it was to "establish his contribution to the Truth Tellers" because the

Plaintiff would own the documentary that he had already started work on in August
of 2019. 9/24/21 Tr. at 66:6–16. He stated clearly that Ms. Meador agreed to the
issuance of the check, knew exactly how much he was going to withdraw, and she
knew that the funds were going to be put towards Mr. Levine's mortgage and living
expenses. 9/24/21 Tr. at 66:12–67:9. Ms. Meador testified that she was never
consulted about these "Creative Rights," and that, in fact, Mr. Levine had formed a
separate company, called Our Climate, which was going to hold intellectual
property and, specifically, scripts. 9/23/21 Tr. at 127:6–19.

8.  Regarding the $19,000, Mr. Levine asserted that the Plaintiff received a benefit
because Mr. Levine "put it in business," as he had "a contract that [he] worked, [he]
had started negotiating with the More to Life Foundation back in May," and had
already done "probably . . . twelve interviews . . . [a]nd probably submitted five or
six different proposals." 9/24/21 Tr. at 68:21–69:8.

9.  On September 13, 2019, the $700 transfer out of the Plaintiff's account went to
ThreeSquare. 9/23/21 Tr. at 180:14–22. ThreeSquare, at that time, was completely
unrelated to the Plaintiff and Indeco Union. 9/23/21 Tr. at 181:6–182:12. Mr.
Levine testified that the payment actually went to expenses surrounding their
preparation for filming in Washington, D.C., including press passes and equipment.
9/24/21 Tr. at 70:3–11. He stated that he and Ms. Meador had a discussion about
where to attribute the expenses, and they both agreed to use ThreeSquare for that
purpose. 9/24/21 Tr. at 71:1–9; 9/24/21 Tr. at 166:18–167:13.

10. On September 18, 2019, the $15,000 transfer out of the Plaintiff's account went to
Indeco. 9/24/21 Tr. at 43:12–14; 9/24/21 Tr. at 75:1–24. Mr. Levine characterized

28

this transfer as an investment in Indeco that was eventually documented in the Truth Tellers Note.  9/24/21 Tr. at 168:14–24; *see infra*.

11. On September 20, 2019, the $15,250 transfer out of the Plaintiff's account went to Indeco.  9/24/21 Tr. at 43:18–20; 9/24/21 Tr. at 75:1–24.

12. Mr. Levine testified that these two September transfers to Indeco were known and approved by Ms. Meador; she agreed that "it would be prudent and make the most sense for her to put money into Truth Tellers and for Truth Tellers to make these investments in Indeco" so any future profits from Indeco would ultimately flow back to Truth Tellers.  9/24/21 Tr. at 77:14–23.

13. It was not until March of 2020, after Mr. Levine had ended the relationship with Ms. Meador, that she claims she checked the Plaintiff's bank account expecting there to be $50,000 (from her transfers on September 6 and September 16, 2019), and found that those funds were gone.  9/23/21 Tr. at 124:16–125:11; 9/23/21 Tr. at 139:8–139:15.  In fact, Ms. Meador testified that she had been denied online access to the Plaintiff's bank account.  9/23/21 Tr. at 139:16–19.  She explained that Mr. Levine had changed the password around the time of the Truth Teller's Note; when she accessed the linked accounts, she could no longer see the Plaintiff's balance or transactions.  9/23/21 Tr. at 139:21–140:6.

14. Ms. Meador asserted that, although she had made transfers into the Plaintiff's account subsequent to the original $50,000, when she looked into the account in March of 2020, she still expected the account to be at $50,000 because it had been earmarked for the Plaintiff's documentary; even though the documentary

eventually fell through, she expected that it would still be there and earmarked. 9/24/21 Tr. at 39:1–16.

15. Ms. Meador testified that after realizing she could not access the Plaintiff's account she requested the password, but Mr. Levine "would say he would and then he wouldn't do it." 9/23/21 Tr. at 140:7–11.

16. In contrast, Ms. Meador admitted in her Amended and Corrected Responses to the Defendant's First Set of Requests for Admissions that she had access to all bank accounts of the Plaintiff from its formation, she had the ability to review all bank transactions of the Plaintiff from its formation, and she had the ability to limit access to all bank accounts of the Plaintiff from its formation. 9/23/21 Tr. at 141:17–143:4.

17. Ms. Meador testified that she had not accessed the Plaintiff's bank account at all because Mr. Levine "came on very strong," told her she was "his great love," that he was going to leave his wife for her, made plans for the future with her, and "put on a very convincing act" that made her "trust[] him completely." 9/23/21 Tr. at 184:17–9.

18. Ms. Meador claims she did not consent to any of the transfers out of the account, and that Mr. Levine had not asked her about making any of the transfers. 9/23/21 Tr. at 125:17–22. He had never requested a document authorizing the transfers out of the account pursuant to his status as Secretary, nor did he offer any kind of promissory note with regards to the missing funds. 9/23/21 Tr. at 125:23–126:4. Ms. Meador stated firmly that Mr. Levine did not have authorization to spend any money out of the Plaintiff's bank account, and that, in fact, he had concealed the

transfers from her by not informing her about them.  9/23/21 Tr. at 128:10–13;
9/24/21 Tr. at 51:7–10.

19. Ms. Meador asserts that none the transfers out of the account went to the Plaintiff's
business or business interests.  9/23/21 Tr. at 126:17–19.  She stated that she had
looked at the Indeco bank statements, and Mr. Levine had transferred money into
Indeco, and then immediately withdrew $5,000 in cash from the Indeco account.
9/23/21 Tr. at 126:12–16.

20. However, the Court finds that Ms. Defendant's testimony on these matters is more
credible than evidence presented by Plaintiff.  Ms Meador had access to the
Plaintiff's bank account at the time of the Disputed Transfers.  It necessarily follows
from her testimony that she lost access to this account around the time of the Truth
Tellers Note in February 2020 that she had previously been able to and did access
that account.  She admittedly knew how to, and did regularly, electronically access
linked accounts of other companies.  The Court therefore finds that Ms. Meador
was aware of the Disputed Transfers as a result of accessing that account prior to
February 2020.

21. Despite Ms. Meador's awareness of the Disputed Transfers, the record is devoid of
evidence that Ms. Meador objected to the Disputed Transfers until after Defendant
terminated their relationship.

***The Truth Tellers Note***

1. On February 3, 2020, on behalf of the Plaintiff, Ms. Meador signed the Indeco
Union Note Purchase Agreement (the "Truth Tellers Note" or "Note"), which had
been previously signed by Mr. Levine on behalf of Indeco Union.  Defendant's

31

Exh. A.  Ms. Meador noted in her testimony that, between the time she opened the document to the time she signed the document, only "a minute and a half" had elapsed, she had not read the document, and that she signed it because Mr. Levine told her to.  9/23/21 Tr. at 148:10–22; 9/23/21 Tr. at 153:24–154:1; 9/23/21 Tr. at 178:3–6.  To be clear, she was not in Mr. Levine's presence when she signed the Note; Ms. Meador was at home by herself.  9/23/21 Tr. at 148:23–149:5.

2.  Ms. Meador testified that she signed the Note without reading it because she "had complete trust in David Levine" based on his professions of love, and they had "mutual interest."  9/24/21 Tr. at 48:11–22.

3.  The Note was Mr. Levine's idea.  9/24/21 Tr. at 34:9–18.  He felt it would benefit the Plaintiff because it would provide a "major security interest in Indeco," which would have either "converted into qualified financing at a discount," or, if Indeco failed, then "the funds would be paid back to the [Plaintiff] from Indeco."  9/24/21 Tr. at 113:6–18.

4.  The Note provided that, on the closing date, the Plaintiff would invest $161,500, with $86,500 being new cash, and $75,000 for cash received previously, on the following dates: August 30, 2019 ($20,000), September 16, 2019 ($30,000), and November 29, 2019 ($25,000).  Defendant's Exh. A.  Ms. Meador claimed that the amounts and dates listed in the Note did not correspond exactly with the transfers made out of the Plaintiff's bank account.  9/23/21 Tr. at 145:21–146:5.

5.  The Note came about because "throughout the fall, [Mr. Levine] had gotten all kinds of loans" from Ms. Meador, and he would "promise paperwork and it would never appear."  9/23/21 Tr. at 178:17–20.  She stated that Mr. Levine "got about

$75,000 out of me in loans to Climate Pictures and he, from what he told me, these loans were going to be in the note purchase agreement." 9/23/21 Tr. at 178:20–23.

6. Mr. Levine testified that the Note was a way to, "as a fiduciary," "ensure that [the Plaintiff] had full credit for everything that Ms. Meador had put into the [Plaintiff] and [he] wanted her interests as well as the interests of the [Plaintiff] as an organization to be protected." 9/24/21 Tr. at 111:13–19. He alleges that he and Ms. Meador spent a great deal of time going through the numbers and the expenses that Ms. Meador wanted included and "at least five or six" drafts were sent back and forth before the final was signed. 9/24/21 Tr. at 111:22–112:11.

7. Despite signing the note, Ms. Meador explained that it didn't make sense to her because "the money [had] already been spent and [hadn't] been spent on anything having to do with Indeco." 9/23/21 Tr. at 178:23–179:6.

8. Ms. Meador claims that the $75,000 number in the Note for cash received previously was for a loan she made to Climate Pictures. 9/23/21 Tr. at 179:7–14. In her opinion, the Note had nothing to do with the funds transferred out of the Plaintiff's bank account in September of 2019. 9/23/21 Tr. at 179:19–180:2.

***Indeco Union***

1. Indeco is one of Mr. Levine's companies; he founded the company in 2017. 9/23/21 Tr. at 120:4–10.

2. In November of 2019, Mr. Levine created a report for the purpose of raising money into an investment vehicle, "a tax advantage qualified opportunity fund that would be managed by Indeco." 9/24/21 Tr. at 89:10–17; Defendant's Exh. F. At that time, Mr. Levine asserts, Ms. Meador was "extremely enthusiastic" about the Indeco

business opportunity, but did express some trepidation about the level of effort and staffing and, essentially, how the organization was going to be built. 9/24/21 Tr. at 90:7–15. The relationship between Basic Space, ThreeSquare, and Indeco was to be as follows: Indeco would provide the "technical infrstructure, meaning the software," and "ThreeSquare would sell the hard assets to Basic Space," and "Basic Space would have the income and the security of hard real estate assets." 9/24/21 Tr. at 92:10–19.

3. According to Ms. Meador, Mr. Levine brought Indeco up and discussed with her the fact that he thought they could raise $50 million under "some regulation, and this would be a securities token offering." 9/23/21 Tr. at 120:12–22. This conversation occurred around the same time Mr. Levine filed his personal bankruptcy case. 9/23/21 Tr. at 121:1–5. Mr. Levine claimed that the $50 million conversation was about creating a balanced portfolio with solid real estate assets helping to support the not-as-profitable documentary production, as well as a block chain startup. 9/24/21 Tr. at 71:1–10.

4. However, the original idea for Indeco (and Basic Space and ThreeSquare) went by the wayside when Ms. Meador, on behalf of Basic Space, declined to purchase a building from ThreeSquare. 9/24/21 Tr. at 93:22–94:24. That is when Mr. Levine pivoted Indeco to hemp production as a "perfect block chain opportunity." 9/24/21 Tr. at 95:1–23. Ms. Meador agreed and said "let's go for it." 9/24/21 Tr. at 95:23–25.

5. Ms. Meador herself was responsible for "Howard Farm," which was a planned community she was investigating for Basic Space, and she was considering using

34

hemp as a building material.  9/24/21 Tr. at 98:3–16; 9/24/21 Tr. at 103:1–7.  She loved the direction Indeco was taking, as she thought Howard Farm would be a "test bed for the whole supply chain."  9/24/21 Tr. at 98:8–16.  Ms. Meador and Mr. Levine had extensive conversations "every day" about getting outside investors, potentially engaging an investment banker, and "making it work."  9/24/21 Tr. at 103:13–24.

6.  Ms. Meador spoke extensively about Indeco and its foray into hemp farming in February of 2020, stating that it would be "purveying information," and that it was "well-placed to develop a framework for the use of technical solutions or to make the leap to adaptive challenges."  9/24/21 Tr. at 28:21–31:6; Defendant's Exh. E. She stated that she wanted to "tie in Howard Farm" and use it as a "model . . . using [Indeco's] service in that it would be good advertising for Indeco."  Defendant's Exh. E.

7.  Mr. Levine testified that, in February of 2020, around the time the Truth Tellers Note was executed, Indeco had no employees on the payroll, but had received money for two offerings: (1) a website called Crypto Launch and (2) consulting agreements.  9/24/21 Tr. at 168:17–169:10.  Indeco was, at that time, pivoting to the hemp idea.  9/24/21 Tr. at 169:11–22.  But, it possessed technology: an application, a "tech stack," an analytics engine, code on a block chain, and the Crypto Launch website.  9/24/21 Tr. at 173:11–18.

8.  After he filed for individual bankruptcy protection, Mr. Levine convinced Ms. Meador to invest in Indeco, and she did so, allegedly via the wire transfers from the Plaintiff's bank account and pursuant to the Truth Tellers Note.  9/23/21 Tr. at

122:3–5; 9/23/21 Tr. at 123:9–13.  She also signed over her IRA's to Indeco in March of 2020; she claims Mr. Levine immediately fired her from Climate Pictures and terminated their relationship once the funds (in the amount of $232,500) were wired to the Indeco account.  9/23/21 Tr. at 123:2–8.  Mr. Levine admitted to firing Ms. Meador from Climate Pictures and terminating their relationship on March 11, 2020, which was only two days after Indeco received the $232,500 wire.  9/24/21 Tr. at 153:9–154:22.  He stated the reason for her termination was the result of Ms. Meador making it "very clear to him" that they could not continue a professional relationship if their personal relationship ended, and his own personal opinion that she was unable to "separate business and intimacy and [] it really affected her ability to serve in this capacity" with Climate Pictures.  9/24/21 Tr. at 207:2–208:5.

9.   On February 10, 2020, Mr. Levine, as CEO, and Matthew Melman, as CTO, submitted a 13-page VC Grant Application to Block.one, a block chain creator, on behalf of Indeco.  Defendant's Exh. D.  Ms. Meador assisted in preparing the document by "edit[ing] it fairly extensively."  9/24/21 Tr. at 97:21–98:2.

10.  Indeco was eventually forced into involuntary bankruptcy by Ms. Meador, and this Court eventually entered the Order for Relief.  9/23/21 Tr. at 175:22–176:8.

## B.  Conclusions of Law

1.   Mr. Levine, at all times relevant to this matter, had a fiduciary duty to the Plaintiff in his role as Secretary of Truth Tellers.

2.   Ms. Meador was aware of the Disputed Transfers.

3.   Ms. Meador never protested or objected to the Disputed Transfers until Mr. Levine ended their physical and romantic relationship in March of 2020.

4. The Disputed Transfers were made with the consent and authority of Ms. Meador as sole member and President of Truth Tellers.

5. The Disputed Transfers were not an act of defalcation by Mr. Levine under 11 U.S.C. § 523(a)(4).

6. Ms. Meador, by her silence following the Disputed Transfers, ratified Mr. Levine's actions.

7. Fraud, under § 523(a)(4) presents a higher bar than that of defalcation because it requires evidence of intentional deceit. The record does not demonstrate that Mr. Levine possessed this requisite mindset.

8. The Disputed Transfers were not an act of fraud by Mr. Levine under 11 U.S.C. § 523(a)(4).

9. Embezzlement, under § 523(a)(4) also presents a higher bar than that of defalcation because it requires evidence of actual, intentional fraud, or in other words, wrongful intent. The evidentiary record likewise does not demonstrate that Mr. Levine possessed the requisite mindset for embezzlement.

10. The Disputed Transfers were not an act of embezzlement by Mr. Levine under 11 U.S.C. § 523(a)(4).

11. The Disputed Transfers are not rendered nondischargeable under 11 U.S.C. § 523(a)(4) and are thus dischargeable in Mr. Levine's bankruptcy case.

**III.**

37

Therefore, in accordance with the Court's findings of fact and conclusions of law,

**IT IS ORDERED** that the relief sought in the **Complaint** be, and hereby is, **DENIED.**   The

Disputed Transfers are dischargeable by Mr. Levine in his bankruptcy case.   Once the time period

has passed for the lodging of an appeal, the Clerk's Office is directed to close the above-captioned

adversary proceeding.

The Clerk's Office shall serve a copy of this written opinion and order on Plaintiff,

Plaintiff's Counsel, Defendant, Defendant's Counsel, the Chapter 13 Trustee, and the United

States Trustee.